# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

|  |  |  |
|---|---|---|
| DAWN M. TINDALL-KOLTHOFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:15CV46NCC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Dawn M. Tindall-Kolthoff (Plaintiff) for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Plaintiff has filed a Brief in Support of the Complaint. (Doc. 20). Defendant has filed a Brief in Support of the Answer. (Doc. 17). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 10).

## I.
## PROCEDURAL HISTORY

On February 6, 2012, Plaintiff filed an application for DIB, and, on April 16, 2012, she filed an application for SSI. In both applications she alleged a disability onset date of January 1, 2012. (Tr. 139-44, 145-46). Plaintiff's applications were denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 78-79, 90-91). After a hearing, by decision, dated February 12, 2014, the ALJ found Plaintiff not disabled. (Tr. 11-25). On June 5, 2015, the

Appeals Council denied Plaintiff's request for review. (Tr. 1-3). As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. See id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). See Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589;

Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be

produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) The claimant's daily activities;

> (2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

> (3) Any precipitating or aggravating factors;

> (4) The dosage, effectiveness, and side effects of any medication; and

> (5) The claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ

need only acknowledge and consider those factors.  See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence.  Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).  Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used.  An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible.  See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons.  See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v.

Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

### III.
### DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff, who was born on April 28, 1974, testified at the administrative hearing that she lived with her husband and ten-year-old son; that she last worked in January 2012; that she had a high school equivalency diploma; that she could read, write, and do simple math; that she could walk for about 15 minutes before having to sit down; that she could stand in one place for about 10 minutes; that she could sit for about 25 minutes; that she dropped things a lot; that she had headaches 2 to 3 times a week, which lasted from 1 to 3 hours; that she had ringing in her ears which sounded like a train; that she had numbness from her left elbow down to the tips of her fingers; that she had numbness in her right hand and toes; that she had low back pain which went into her buttocks on both sides; that she felt nauseous and had to vomit at least once a day; that this vomiting had happened for the 3 or 4 years prior to the hearing; that she had bad days with her bipolar disorder 3 to 4 times a week; that she had anxiety attacks at about 4:00 p.m. every day; that she had manic days at least once a week; and that, when she had manic attacks, she could not sleep for two to four days. (Tr. 34-36, 39-40, 43-44, 46-49, 51-52).

The ALJ found that Plaintiff met the insured status requirements since January 1, 2012, her alleged onset date; that she had the severe impairments of degenerative disc disease,

borderline personality disorder, bipolar disorder, depression and anxiety; and that she did not have an impairment or combination of impairments which met or medically equaled a listed impairment. The ALJ further found that Plaintiff had the RFC to perform a range of sedentary work, with the following limitations: Plaintiff would require a sit/stand option allowing her to sit or stand alternatively, at will, provided that she was not off task by ten percent of the work period; she could occasionally push and pull bilaterally; she could never climb ladders, ropes, or scaffolds; she could occasionally climb ramps or stairs, stoop, crouch, kneel and crawl; she could have only occasional rotation, flexion, and extension of the neck; she could frequently reach, including overhead reaching, bilaterally; she could frequently handle and finger bilaterally; she had to avoid concentrated exposure to extreme cold and heat; she had to avoid all exposure to use of hazardous machinery and unprotected heights; she was limited to simple, routine, and repetitive tasks, with no strict production quotas; she could only occasionally interact with the general public; and she could be around co-workers throughout the day, but with only occasional interaction with them. The ALJ concluded that Plaintiff could not perform her past relevant work; that, based on the testimony of a VE, there was work in the national economy which Plaintiff could perform; and that, therefore, she was not disabled within the meaning of the Act.

Plaintiff argues that the ALJ's decision is not based on substantial evidence because: (1) the ALJ failed to give controlling weight to the opinion of Nitin Kukkar, M.D.; (2) the ALJ failed to find that Plaintiff's bipolar disorder equaled the criteria for Listing 12.04; and (3) the ALJ's credibility determination was "patently erroneous." For the following reasons, the court finds that Plaintiff's arguments are without merit and that the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

**A.      Plaintiff's Credibility:**

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ.  See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence.  Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered Plaintiff had a mild restriction in regard to her daily activities. In this regard, the ALJ considered Plaintiff was able to care for her ten-year-old son; that she prepared meals, made beds, and folded laundry; and that she enjoyed gardening for herself and her neighbors. (Tr. 15). The court notes that Plaintiff stated, in a Function Report – Adult dated May 31, 2012, that she made breakfast for her son; that she went to physical therapy three days a week; that she went outside with her son and "walk[ed] around the yard"; that she fixed dinner; that she fixed her own meals, although, "at times, friends ma[d]e" meals; that she dusted occasionally and made the bed and did laundry daily; that she went outside on a daily basis; that she went out alone; that she drove; that she shopped in stores for groceries and clothing; that she could pay bills, handle a savings account, count change and use a checkbook; that she spent time with others, including her son and his friends; that she did not need reminders to go places or need someone to accompany her; that she did not have any problems getting along with family friends, neighbors, or others; and that her disabling conditions did not affect her ability to talk, hear, see, and get along with others. (Tr. 173, 175-78). Also, as considered by the ALJ, Plaintiff told her counselor, on May 9, 2013, that she was gardening for herself and her neighbors; that

her staying active was something she liked; and that staying active helped her to focus less on the negative things and to feel better about herself. (Tr. 21, 722).

While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, a claimant's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart"). Moreover, to the extent Plaintiff urges the court to reweigh the evidence regarding Plaintiff's daily activities and draw its own conclusion in this regard, it is not the function of the court to do so. See Bates v. Chater, 54 F.3d 529, 531-32 (8th Cir. 1995) ("As we have stated many times, we do not reweigh the evidence presented to the ALJ, and it is the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant and other witnesses.") (internal citations, punctuation, and quotations omitted). To the extent Plaintiff specifically argues that the ALJ should not have considered Plaintiff's ability to do housework and perform self-care when she felt able to do so because the ability to do light housework does not mean Plaintiff had the ability to perform work activities (Doc. 20 at 23), Plaintiff's daily activities, including her ability to perform light housework, were only one of many factors considered by the ALJ when determining Plaintiff's credibility.

Second, the ALJ considered inconsistencies in the record and that the record "tended to diminish the credibility of [Plaintiff's] testimony." (Tr. 18). In this regard, the ALJ considered that, on August 8, 2012, approximately eight months after her alleged onset date, Plaintiff told a

medical provider that she was looking for work (Tr. 553); that, on October 3, 2012, ten months after her alleged onset date, Plaintiff told another medical provider that she would like to work, "although she wanted to do something that she liked to do" (Tr. 537); and that the evidence suggested that Plaintiff "believes that there was some kind of work activity she could perform." (Tr. 18). The ALJ also considered that although Plaintiff testified that she had been vomiting daily for the last three or four years, on March 22, 3012, she told a provider that she had occasional nausea, but no vomiting (Tr. 327); that, on September 1, 2013, a provider noted that Plaintiff said that her back and neck pain were worse after a couple of days of riding a motorbike (Tr. 709); that, when asked at the hearing about this statement, Plaintiff testified that she did not remember making it; and that, on May 9, 2013, as discussed above, Plaintiff told a mental health provider that she liked to say active (Tr. 722).

Plaintiff contends that the ALJ improperly considered Plaintiff's reports that she wanted to work. (Doc. 20 at 22). Nonetheless, contradictions between a claimant's sworn testimony and what she actually told health care providers weighs against the her credibility. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006). Moreover, a claimant's admitting an ability to work is a proper consideration for an ALJ. Cf. Melton v. Apfel, 181 F.3d 939, 942 (8th Cir. 1999) (finding that a claimant's continued job search "undermine[d] his claim that he was unable to work"); Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991) (finding claimant's application for unemployment benefits adversely affected his credibility; "[a] claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work.").

Third, the ALJ considered Plaintiff's non-compliance with the recommendations of her health care providers, and that, in order to receive benefits, a claimant must follow her doctor's

treatment plan if "this treatment can restore her ability to work." Specifically, as provided by the case law and Regulations, the ALJ considered that "failure to follow prescribed treatment can be taken into consideration in not awarding benefits." (Tr. 18-19). See Wright v. Colvin, 789 F.3d 847, 854 (8th Cir. 2015) (affirming where ALJ found that claimant's "credibility suffered from his refusal to take pain medication and his refusal to seek out even conservative treatments such as physical therapy"); Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (noncompliance is a basis for discrediting a claimant; when claimant was compliant with dietary recommendations his pain was under good control; claimant's noncompliance with a diet regimen prescribed by doctor contributed to a negative credibility determination).

In regard to Plaintiff's non-compliance, the ALJ considered, and the record establishes, that Plaintiff's "flare-ups of [her] mental symptoms often occur[red] after she ha[d] stopped taking prescribed medications" (Tr. 252, 490); that, in February 25, 2011, after she presented to the emergency room (ER) with chest pain, Plaintiff "was adamant that she be discharged [] the next day before testing was completed" (Tr. 320-322); that, in December 2012, prior to surgery Plaintiff reported smoking for 28 years and her orthopedic surgeon told her that smoking cessation would help with her general health and bone healing after surgery (Tr. 498, 513); and that, when Plaintiff established care with a new doctor, in October 2013, she reported that she was "still a current every day smoker" (Tr. 716). The court also notes that, on April 19, 2011, when Plaintiff had been off her medications since October 2010, she presented with complaints of anxiety, which was acute and persistent (Tr. 252), and that, in February 2012, while in the ER, Plaintiff declined tobacco cessation education. (Tr. 263).

To the extent Plaintiff contends that the ALJ improperly considered her non-compliance because she had a mental impairment (Doc. 20 at 22), courts have recognized that a mental

impairment can interfere with a claimant's ability to follow prescribed treatment and her ability to have sufficient insight into her illness.  See Pate–Fires v. Astrue, 564 F.3d 935 (8th Cir. 2009). However, in the matter under consideration, there was "no evidence expressly linking [Plaintiff's] mental limitations to [her] repeated noncompliance."  Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (noncompliance is a basis for discrediting a claimant; when claimant was compliant with dietary recommendations his pain was under good control; claimant's noncompliance with a diet regimen prescribed by doctor contributed to a negative credibility determination) (distinguishing Pate–Fires v. Astrue, 564 F.3d 935 (8th Cir. 2009), in regard to holding that schizoaffective disorder can prevent claimant from complying with psychiatric medication; claimant in Wildman suffered from depression, non-compliance was failing to follow prescribed diet, there was "no evidence expressly linking [claimant's] mental limitations to such repeated noncompliance, and there was conflicting evidence regarding claimant's alleged memory and concentration impairments).

To the extent Plaintiff specifically argues that the ALJ erred in considering that she failed to follow the recommendations of health care providers that she cease smoking because the record does not establish that if she stopped smoking she would be able to work (Doc. 20 at 23), as acknowledged by the Commissioner and the ALJ (Doc. 17 at 14, Tr. 19), the Regulations provide that an ALJ should find a claimant not disabled based on failure to follow treatment only if the treatment would restore her ability to work.  20 C.F.R. §§ 404.1530, 416.930. Nonetheless, the ALJ did not find Plaintiff's failure to stop smoking was the only reason she was not credible and, ultimately, not disabled; her failure in this regard was one of many factors considered by the ALJ upon determining that Plaintiff's assertions regarding the severity of her conditions were not fully credible.  See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006)

(holding that the ALJ properly considered the claimant's failure to quit smoking in discounting his complaints); Weber v. Harris, 640 F.2d 176, 178 (8th Cir. 1991).

Fourth, the ALJ considered the clinical and objective findings in regard to Plaintiff's alleged physical impairments. (Tr. 19). See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004); Social Security Ruling (SSR) 06-7p(4), 1996 WL 374186, at *1 (July 2, 1996) ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence," although a disability determination "cannot be made solely on the basis of objective medical evidence."). Indeed, a claimant's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." Id. at *2.

As considered by the ALJ, November 23, 2012 magnetic resonance imaging (MRI) showed spinal stenosis with cervical spinal cord deformity at C5-6 and C6-7. An MRI of the lumbar spine, of this same date, showed moderate to severe disc bulging with regions of protrusion producing displacement of traversing nerve roots and Grade 1 anterolisthesis of L5-S1. (Tr. 539-40). After Plaintiff underwent an anterior cervical discectomy and fusion done by Dr. Kukkar, on December 11, 2012, on physical examination at discharge, Plaintiff had full range of motion (ROM) in the major muscle groups; her strength and sensation were grossly intact and symmetric; and Plaintiff said she no longer had pain in her hand. (Tr. 19, 513). Dr. Kukkar recommended that Plaintiff not have physical therapy for the first six weeks after her surgery. Plaintiff then had physical therapy between February 12, 2013 and March 27, 2013. At her first session, Plaintiff's loss of function and motion/stiffness were rated as "mild." Plaintiff

was discharged pursuant to her own request. (Tr. 595-637). Cervical spine x-rays of March 28, 2013, showed her prior fusion at C6-7, a prosthesis at C5 and C6, with the remaining disc spaces well maintained, and no interval changes in comparison to Plaintiff's prior study of December 2012. (Tr. 545, 638).

On May 17, 2013, Plaintiff underwent a neural foraminal block, after which Plaintiff reported complete cessation of pain. (Tr. 704). She had an epidural injection on July 1, 2013, after which Plaintiff "experienced complete relief of her left-sided pain." (Tr. 705). When Plaintiff presented in the ER, on September 1, 2013, with back and neck pain after riding a motor bike for several days, physical examination showed that Plaintiff had "mild" tenderness to palpation of the lumbosacral region of her back; that Plaintiff's lungs were clear; that her vital signs were within normal limits; that she was "in no acute distress other than mild pain and discomfort noted"; that her extremities had no cyanosis, clubbing, or edema; that her cranial nerves "2 through 12 [were] intact; that she had no focal sensory or motor deficits; and that she was able to stand and ambulate without difficulty. (Tr. 709).

When Plaintiff presented for care with Jeffrey Wells, D.O., on October 18, 2013, she complained of back pain which radiated to her head and numbness in her arms from her elbows down, and said she had this pain since her surgery ten months earlier. On examination, Dr. Wells reported that Plaintiff was alert and in no acute distress; that her gait and motor examinations were normal; that she had equal movement in all extremities; that she had full ROM, no asymmetry, deformities, or peripheral edema; that she had no speech difficulties; and that Dr. Wells told Plaintiff he would not be giving her any more narcotic pain medications. (Tr. 716-18).

As for objective findings relevant to Plaintiff's mental conditions, on June 7, 2012, Plaintiff underwent a mental health examination in connection with her application for Medicaid benefits with Licensed Clinical Social Worker Janet Hultgren. David Goldman, J.D., D.O., a psychiatrist, signed off on Ms. Hultgren's report. Ms. Hultgren reported that Plaintiff denied homicidal/suicidal ideations; that Plaintiff's recent memory was good; that her remote memory was fair; that her intellectual functioning, insight, and concentration were good; that she was oriented; that her mood was labile; and that her impression was that Plaintiff had bipolar disorder and a Global Assessment of Functioning (GAF) of 55.[1] On August 8, 2012, Plaintiff reported that she was in a better mood, was moving, and was looking for work. (Tr. 478-79). An October 3, 2012, Adult Mental Health Assessment from Transitions of Western Illinois states that Plaintiff said she had been diagnosed with bipolar disorder, and that her symptoms included trouble falling asleep, feeling badly about herself, being unable to keep her mind on one thing, being irritable, and having mood swings. (Tr. 465). On October 16, 2012, Plaintiff met with Nicole Shields, L.C.P.C., who reported that Plaintiff was "withdrawn, said little other than answering questions posed[,] [and] [w]as tearful at the end but vague about what had triggered

---

[1] Global assessment of functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 32-34 (4th ed. rev. 2000). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 34. See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000) (alterations in original). See also Goff, 421 F.3d at 791, 793 (affirming where court held GAF of 58 was inconsistent with doctor's opinion that claimant suffered from extreme limitations; GAF scores of 58-60 supported ALJ's limitation to simple, routine, repetitive work).

this." (Tr. 536). On October 23, 2012, Ms. Shields reported that Plaintiff was "more open" and "unsure about several things." (Tr. 534). On November 6, 2012, Ms. Shields reported that Plaintiff was "agreeable to ideas discussed," was "willing to follow up with [her] homework and assignment," and said that she was "looking into finding something to do with her time [which] [was] a good step towards her reaching her goal. " Ms. Shields also reported that the plan was for Plaintiff to find a "hobby/interest/volunteer opportunity" and that Plaintiff reported progress in this regard. (Tr. 539). On November 13, 2012, Ms. Shields reported that Plaintiff was "more clear and more open," and that Plaintiff said that day's session "was right for her and that [they] were going [in] the right directions." (Tr. 527). On December 4, 2012, Ms. Shields reported that Plaintiff said that "her physical health [was] the primary obstacle at [that] moment." (Tr. 523).

On December 6, 2012, Valentina Vrtikapa, M.D., conducted a psychiatric evaluation of Plaintiff and reported that, on examination, Plaintiff made good eye contact; that her language was appropriate; that her mood was depressive and anxious; that her affect was "somewhat constricted"; that Plaintiff denied hallucinations, paranoia, and delusions; and that she was awake and oriented. Dr. Vrtikapa diagnosed Plaintiff with bipolar disorder, not otherwise specified, borderline personality disorder, and a GAF of 50. (Tr. 490-91). On December 20, 2012, Plaintiff reported feeling happier following neck surgery, as she had a reduction in pain. (Tr. 515). On January 3, 2013, Plaintiff told Dr. Vrtikapa that she was "doing well." (Tr. 673). On January 10, 2013, Plaintiff told Ms. Shields that she had "improved mood and energy which she link[ed] to continued recovery from surgery." (Tr. 678). On January 17, 2013, Ms. Shields reported that Plaintiff had made progress that day "in the area of exploring [the] impact of her past on her present." (Tr. 679). On February 5, 2013, Ms. Shields reported that Plaintiff had "improved life satisfaction," and was "okay with spacing appts out further." (Tr. 680). On

February 25, 2013, Ms. Shields reported that Plaintiff was more open about her past" and was tearful. Ms. Shields further reported that progress had been made, and that Plaintiff said "she felt lighter after [that] session and [thought] it was productive." (Tr. 681). On March 19, 2013, Ms. Shields reported that Plaintiff appeared sad, tired, withdrawn and anxious, and was "receptive to anxiety management techniques but unable/unwilling to talk about other subjects" that day. (Tr. 684). On April 23, 2013, Dr. Vrtikapa increased Plaintiff's medication to reduce her symptoms. (Tr. 691). When Plaintiff saw Dr. Vrtikapa, on May 2, 2013, she reported that she was doing well. (Tr. 664).

Notes from May 2, 2013, reflect that Plaintiff's mental status examination was normal, including that her behavior, speech, affect, thought process, insight, judgment, and cognition were normal. (Tr. 664). On May 9, 2013, Ms. Shields reported that Plaintiff's response to the day's intervention was open; that her mood was more stable in the prior few weeks; that she had more energy and had been gardening; that Plaintiff's mood had improved; and that she focused less on negative events from her past. (Tr. 722).

Fifth, as considered by the ALJ, Plaintiff's conditions improved with treatment. As discussed above in regard to the medical evidence of record, after neck surgery, in December 2012, Plaintiff had full ROM, intact strength and sensation, and no longer had pain in her hand; in February 2013, at her first physical therapy session after surgery, Plaintiff had mild symptoms and a mild degree of loss of motion and functioning; on March 27, 2013, Plaintiff was discharged from physical therapy at her own request; after having a neural foraminal block, on May 17, 2013, Plaintiff reported cessation of low back pain; and, after a July 1, 2013 injection, Plaintiff reported complete relief of her left-side pain. (Tr. 19).

In regard to Plaintiff's mental conditions, as set forth above, Plaintiff reported, in August 2012, that her "general mood [was] much better"; that an increase in her dosage of Celexa had helped her mood; that trazadone had improved her sleep; and that she was not "groggy" in the morning. (Tr. 553). On December 11, 2012, Plaintiff stated that her mental impairments were fairly well controlled with medication and that counseling helped. (Tr. 498, 501). Also, on December 20, 2012, Plaintiff's counselor reported that Plaintiff had a "dramatic improvement in [her] mood and level of satisfaction following recent neck surgery." (Tr. 515). In January 2013, Plaintiff's counselor reported that Plaintiff was more relaxed and had improved mood and energy. The counselor associated these improvements with Plaintiff's continued recovery from surgery. (Tr. 677-78). After Plaintiff reported increased depression, in April 2013, her medication dosage was adjusted, and, on May 2, 2013, Plaintiff said that she was doing well on the increased dosage. In fact, on May 2, 2013, it was reported that Plaintiff's medication efficacy was good. (Tr. 688-92, 664). On May 9, 2013, Plaintiff said that her mood had been more stable in the prior few weeks; that she had improved energy; and, as discussed above, that she had been gardening for herself and her neighbors. (Tr. 722).

Sixth, the ALJ considered lapses in Plaintiff's medical treatment. In particular, the ALJ considered that although Plaintiff was advised to follow-up with her doctor when she presented to the ER on September 1, 2013, with back pain, the record does not reflect that Plaintiff presented for treatment until October 18, 2013, when she established care with Dr. Wells. (Tr. 20). A lack of regular treatment for an alleged disabling condition detracts from a claimant's credibility. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination that a claimant lacked credibility due in part to "absence of hospitalizations . . ., limited treatment of symptoms, [and] failure to diligently seek medical care").

Seventh, the ALJ considered that Plaintiff underwent a mental health examination in connection with her application for Medicaid benefits with Ms. Hultgren, as described above; that Dr. Goldman, a psychiatrist, signed off on the examination; that both Ms. Hultgren and Dr. Goldman were specialists in their fields; that Ms. Hultgren recommended that Plaintiff receive Medicaid; and that Plaintiff was found disabled for purposes of receiving Medicaid based on the report of Ms. Hultgren and Dr. Goldman. The ALJ, however, found that this determination was not binding on the Commissioner in regard to Plaintiff's applications for disability under the Act, although the Medicaid determination was a factor to consider. The ALJ concluded that the determination that Plaintiff was disabled for purposes of Medicaid should be given "little weight" because the issue of Social Security disability is reserved for the Commissioner; the issue was whether Plaintiff had the RFC to perform work activity; and the medical evidence of record (MER) supported the conclusion that Plaintiff could "work well within" the RFC which the ALJ assigned to her. (Tr. 22).

Plaintiff contends that the ALJ erred in discounting the assessment of Ms. Hultgren because the evidence of disability from another governmental or non-governmental agency must be considered. (Doc. 20 at 23). Indeed, findings of disability by other federal agencies, even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision. Morrison v. Apfel,146 F.3d 625, 628 (8th Cir. 1998) (citing Wilkins v. Callahan, 127 F.3d 1260, 1262 (10th Cir. 1997); Baca v. Department of Health and Human Services, 5 F.3d 476, 480 (10th Cir. 1993); Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979)). An ALJ, however, "is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits, 20 C.F.R. § 404.1504." Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006) (quoting Fisher v. Shalala, 41

F.3d 1261, 1262 (8th Cir. 1994) (per curiam) ("There is no support for [the claimant]'s contention that his sixty-percent service-connected disability rating equates with an inability to engage in any substantial gainful activity under social security standards."). In the matter under consideration, the ALJ did not ignore the findings of Ms. Hultgren regarding Plaintiff's eligibility for Medicaid. Rather, he considered and discussed the underlying medical evidence and stated his reasons for disagreeing with the determination that Plaintiff was disabled. See id. Significantly, when recommending that Plaintiff receive Medicaid coverage, Ms. Hultgren was applying the regulations of another governmental agency. In any case, Ms. Hultgren's findings, upon examination of Plaintiff, that her intellectual functioning, insight, and concentration were good, that she was oriented, and that her recent memory was good and remote memory fair, are not inconsistent with the RFC which the ALJ assigned to Plaintiff. As such, the court finds that the ALJ gave proper weight to Ms. Hultgren's opinion that Plaintiff should receive Medicaid.

Eighth, the ALJ considered that Plaintiff "was able to participate in the administrative hearing closely and fully without being distracted and without any overt pain behavior," and that she was able to respond to questions by her examiners in an appropriate manner. (Tr. 18). Plaintiff contends that the ALJ erred in considering her demeanor at the hearing. (Doc. 20 at 21-22). While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration, Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); Jones v. Callahan,122 F.3d

1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible."). Here, to reach his conclusion, the ALJ combined his review of the record as a whole with his personal observations.

Ninth, the ALJ considered third-party function reports filed by Plaintiff's current and ex-husbands, and that these reports generally supported Plaintiff's allegations regarding the severity of her impairments. The ALJ afforded these reports little weight for the same reasons he discounted Plaintiff's allegations regarding the severity of her conditions, and gave them weight only to the extent they were consistent with the medical evidence of record. (Tr. 22, 196-204, 212-15). An ALJ may discount corroborating testimony on the same basis used to discredit the claimant's testimony. See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 2006). Further, to the extent Plaintiff suggests that the ALJ did not consider third-party evidence in sufficient detail, where the same evidence that the ALJ relied upon when discrediting the testimony of the claimant would have been the same evidence which would have supported discrediting the testimony of third parties, the ALJ's failure to fully address the assertions of third parties is "inconsequential." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

In conclusion, the court finds that the ALJ gave good reasons for finding Plaintiff's allegations regarding the severity of her conditions not fully credible, and that the ALJ's analysis was carefully linked to the evidence of record. See Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) ("If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment.") (internal quotation marks and citation omitted). As such, the court further finds that the ALJ's credibility determination is based on substantial evidence and is consistent with the Regulations and case law.

**B.    Opinion of Nitin Kukkar, M.D.:**

In a Medical Source Statement of Ability to Do Work-Related Activities (Physical), dated October 31, 2013, Dr. Kukkar opined that Plaintiff could lift and carry no more than 20 pounds on an occasional basis; that she could lift and carry no more than 10 pounds on a frequent basis; that she could stand and walk, with normal breaks, 4 hours in an 8-hour workday; that she could sit, with normal breaks, 6 hours in an 8-hour workday; that she could sit for 45 minutes before having to change positions; that she could stand 20 minutes before having to change positions; that she had to walk around "6-7" times in an 8-hour day; that she needed the opportunity to shift at will "from sitting or standing/walking"; that she needed to lie down at unpredictable intervals; that she could frequently twist, stoop, climb stairs and ladders, reach, handle, finger, and feel; that she could occasionally crouch and push/pull; that she should avoid concentrated exposure to extreme cold and heat, high humidity, perfumes solvents/cleaners, and chemicals; that she should avoid moderate exposure to fumes, odors, dusts, gases, and "soldering fluxes"; that she would have to be absent about 4 days a month; that 20% of the time during a typical workday Plaintiff's symptoms would be severe enough to interfere with her attention and concentration need to perform even simple work; that she needed to take unscheduled 10 minute breaks 4 to 5 times a day; and that these limitations were a result of her neck and/or back pain. (Tr. 712-15). The ALJ gave Dr. Kukkar opinion only partial weight. (Tr. 21). Plaintiff argues that the ALJ erred in doing so because Dr. Kukkar was her treating doctor and a specialist in orthopedics, and that, therefore, Dr. Kukkar's opinion should have been given controlling weight. (Doc. 20 at 15-25). For the following reasons, the court finds that the ALJ gave proper weight to Dr. Kukkar's opinion, and that the ALJ's decision in this regard is based on substantial evidence and is consistent with the case law and Regulations.

First, the ALJ gave Dr. Kukkar's opinion partial weight because "it appear[ed] that the limitations [he imposed] regarding [Plaintiff's] missing work and being off task appear[ed] to be sympathetic opinions," and were not consistent with Dr. Kukkar's own objective findings.  (Tr. 21).  See Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (affirming where ALJ declined to give treating doctor's opinion controlling weight where it was inconsistent with the doctor's treatment notes).

Second, upon determining the weight to be given Dr. Kukkar's opinion, the ALJ considered that his opinion was not consistent with the records of other medical providers.  (Tr. 21).  See Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").  In particular, the ALJ considered that, although Plaintiff complained of neck and back pain, one month prior to the hearing, when she presented to Dr. Wells, Dr. Wells stated that he would not prescribe narcotic pain medication for Plaintiff; his findings on physical examination were generally normal, including that Plaintiff had a normal gait and motor examination and full ROM; and he did not order studies or refer Plaintiff to an orthopedic specialist.  (Tr. 21, 716-18).  The court notes that upon discharge after Plaintiff's December 2012 surgery, Plaintiff's strength and sensation were "grossly intact" and she had full ROM in all muscle groups.  (Tr. 513).  As discussed above, at her first session of physical therapy, approximately six weeks after surgery, the therapist described Plaintiff's loss of function and motion/stiffness as mild.  (Tr. 596).  Also, in September 2013, on examination, Plaintiff had only mild tenderness to palpation of her back, she was in no acute distress, and she could ambulate, without difficulty.  (Tr. 709).

Third, the ALJ considered that Dr. Kukkar's opinion that Plaintiff would miss work and be excessively off task was conclusory, with little explanation. Moreover, the limitations Dr. Kukkar indicated were limitations on Plaintiff's ability to perform work-related activities by making checkmarks on a form. (Tr. 21). An ALJ may discount an opinion that "'consists of nothing more than vague, conclusory statements.'" Toland v. Astrue, 761 F.3d 931, 937 (8th Cir. 2014) (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010)). Cf. Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011) (holding that checkmarks on a Medical Source Statement are "conclusory opinions" which can be discounted if contradicted by other objective medical evidence); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("'The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value'. . . . Indeed, '[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'") (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) and Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)).

Fourth, as stated above, when Dr. Kukkar rendered his opinion in October 2013 he had not seen Plaintiff since the prior May. Cf. 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i) ("Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion."); Martise v. Astrue, 641 F3d 909, 926 (8th Cir. 2010) ("When deciding how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.") (internal quotation and citation omitted).

Fifth, the limitations imposed by the ALJ in his RFC determination reflect that he gave some weight to Dr. Kukkar's opinion, to the extent that Dr. Kukkar's opinion was consistent with the record as a whole. See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as reflected in the claimant's RFC demonstrating that the ALJ gave some credit to the opinions of the treating physicians); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions."). Indeed, the ALJ limited Plaintiff to sedentary work, which requires that a claimant be able to lift no more than 10 pounds on a frequent basis and walk or stand for approximately 2 hours in an 8-hour day. 20 C.F.R. §. 404.1567(a). As stated above, Dr. Kukkar opined that Plaintiff could lift and carry no more than 20 pounds on an occasional basis; that she could lift and carry no more than 10 pounds on a frequent basis; and that she could stand and walk, with normal breaks, 4 hours in an 8-hour workday.

Sixth, to the extent Plaintiff argues that the ALJ failed to explain how the weight he gave to Dr. Kukkar's opinion is partial weight (Doc. 20 at 15-17), the ALJ did engage in a lengthy detailed discussed regarding the reasons he gave Dr. Kukkar's opinion only partial weight and the reasons he discredited portions of Dr. Kukkar's opinion.

Seventh, the extreme limitations imposed by Dr. Kukkar were inconsistent with what Plaintiff told medical providers. Indeed, after her December 2012 surgery, Plaintiff stated that her hand was no longer causing her pain. (Tr. 513). Plaintiff reported that she had complete cessation of pain after an injection in May 2013 and complete relief after a July 2013 injection.

(Tr. 704-705). Also, as discussed above in regard to Plaintiff's credibility, she told her counselor, in May 2013, that she was gardening and staying active (Tr. 722), and, in August and October 2012, Plaintiff expressed a desire to work (Tr. 537, 553).

Eighth, although Plaintiff argues that the ALJ should have given Dr. Kukkar's opinion controlling weight because he was an orthopedist, and, therefore, a specialist in his field, the ALJ was not required to give Dr. Kukkar's opinion controlling weight to the extent it was not supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with substantial evidence in the record. In any case, Plaintiff did not receive regular treatment from Dr. Kukkar.[2]  See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) ("Vega's March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When she filled out the checklist, Vega had only met with Randolph on three prior occasions.").

Ninth, Dr. Kukkar did not indicate Plaintiff had extreme limitations in her medical records. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation).

Tenth, upon determining the weight to be given Dr. Kukkar's opinion, the ALJ was fulfilling his role to evaluate the record as a whole. Id. (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole).

Accordingly, the Court finds that the ALJ gave proper weight to Dr. Kukkar's opinion upon determining the severity of Plaintiff's impairments and her RFC, and that the ALJ's decision, in this regard, is based on substantial evidence.

---

[2] Plaintiff suggests that she saw Dr. Kukkar on four occasions, and Defendant suggests Plaintiff saw him three times. In any case, the parties agree that Plaintiff did not see Dr. Kukkar on more than four occasions.

**C.     Listing 12.04:**

If an ALJ finds a claimant has a mental impairment, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent.   20 C.F.R. § 404.1520a(b)(1).   The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work.   20 C.F.R. § 404.1520a(c)(2).   Those areas are:   (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings.   20 C.F.R. § 404.1520a(c)(3).   (For § 12.04 see Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013) (where no episodes of decompensation or demonstrated susceptibility to such episodes, to meet paragraph C criteria, claimant must show current history of inability to function outside a highly supportive living arrangement; highly supportive settings include hospitals, halfway houses, care facilities, and personal home settings that "greatly reduce the mental demands place on [the claimant].").

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme."  20 C.F.R. § 404.1520a(c)(4).  The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more."  Id.  When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).  When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder.  This is

done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.  See 20 C.F.R. § 404.1520a(d)(2).

The Listings describe impairments severe enough to prevent a claimant from doing any gainful activity regardless of age, education, or work experience.  20 C.F.R. §§ 404.1525(a), 416.925(a).  As stated by the Court in Sullivan v. Zebley, 493 U.S. 521, 532 (1990):

> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of [her] age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity."  See 20 C.F.R. § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity") . . .  The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.

Indeed, the burden is on the claimant to show that she meets a listing, including all of a listing's criteria because "[a]n impairment that manifests only some of [the] criteria, no matter how severely, does not qualify.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (quotation omitted).  See also Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014) ("To meet a listing, a claimant must show that he or she meets all of the criteria for the listed impairment.";  "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (internal quotations and citations omitted); Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.").

In relevant part, 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and

consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Section 12.00(a) further lists mental disorders in diagnostic categories. In particular, Listing § 12.04, affective disorder, states:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Thus, pursuant to Listing 12.04, a claimant's affective disorder is disabling when it satisfies, among other things, the Listing's paragraph B criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. Paragraph B requires the claimant to show that her affective disorder has resulted in at least two of the following: marked restriction in daily activities, marked difficulties in social functioning, marked difficulties in concentration, persistence, or pace, or repeated episodes of decompensation. Id. The ALJ found that Plaintiff's mental impairments had resulted in only mild limitation in daily activities, moderate limitation in social functioning, moderate limitation in concentration, persistence, or pace, and no episodes of decompensation. (Tr. 15-16). Thus, the ALJ found that Plaintiff did not meet Listing 12.04.

Plaintiff contends that the ALJ erred in this regard and that her mental impairments did meet Listing 12.04 because the ALJ ignored evidence from her May 2012 Function Report-

Adult (Function Report) which shows that she had difficulty with daily activities, getting along with others, and completing tasks. Plaintiff further argues that the ALJ failed to consider her GAF scores and that they would have established that she met Listing 12.04. (Doc. 20 at 18-20). For the following reasons, the court finds that the ALJ's determination that Plaintiff did not meet Listing 12.04 is based on substantial evidence and is consistent with the Regulations and case law.

First, the ALJ did consider Plaintiff's Function Report, as he specifically discussed Plaintiff's allegations regarding her abilities in explaining why she did not meet paragraph B criteria. (Tr. 15-16). Indeed, the ALJ cited Plaintiff's statements in the Function Report regarding things she could no longer do because of her conditions, but also noted that Plaintiff stated in the Function Report that she could care for her ten-year-old son, prepare meals, dust, make beds, and fold laundry. (Tr. 15, 174-75).

To the extent Plaintiff argues that the ALJ should have considered her statements in the Function Report in greater detail, the ALJ's failure to mention every statement made by Plaintiff in the Function Report does not mean that the ALJ did not consider the Function Report in its entirety. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

The ALJ, moreover, included in Plaintiff's RFC several limitations which reflected Plaintiff's description in the Function Report of what she was capable of doing. For example, Plaintiff said, in the Function Report, that she had difficulty lifting objects, pulling, bending, squatting, and kneeling, and the ALJ limited her to sedentary work, with only occasionally pulling, stooping, crouching, and kneeling. Further, Plaintiff said she had problems

concentrating, understanding, and following instructions, and the ALJ limited her to simple, routine, repetitive tasks with no strict production quotas. (Tr. 16-17, 178).

As for the ALJ's determination that Plaintiff had only a mild restriction in the area of activities of daily living, as discussed above in regard to Plaintiff's credibility, in addition to caring for her young son, Plaintiff reported, in the Function Report, that she did laundry, went outside with her son, attended physical therapy three days a week, dusted occasionally, drove, shopped, and spent time with others. Additionally, as discussed above, Plaintiff said she gardened and the record reflects that she went motorbike riding. As such, the court finds that the ALJ's determination that Plaintiff had only a mild restriction in regard to her activities of daily living is based on substantial evidence.

As for Plaintiff's concentration, persistence, or pace, the ALJ found that Plaintiff had moderate difficulties. (Tr. 16). In this regard, the ALJ considered that although Plaintiff claimed she had difficulty with understanding, memory, concentration, following instructions, and completing tasks, she also stated in the Function Report that she was able to count change, pay bills, handle bank accounts, and drive. Additionally, the medical providers reported that Plaintiff's recent memory was good; that her intellectual functioning, insight, and concentration were good; that she made good eye contact; that her behavior, thought process, insight, and judgment were normal; and that Plaintiff made progress in regard to her mental conditions with counseling, with her recovery from surgery, and with medication adjustment. (Tr. 478-79, 490-91, 527, 539, 664, 673, 679, 681, 691, 722). As such, the court finds that the ALJ's determination that Plaintiff had a moderate limitation in the area of concentration, persistence, or pace is based on substantial evidence.

As for episodes of decompensation, the ALJ considered there was no evidence that Plaintiff had inpatient psychiatric treatment or an exacerbation of her mental symptoms accompanied by a loss of adaptive functioning that lasted for an extended duration. The court finds, therefore, that the ALJ's determination that the B criteria for Listing 12.04 were not met is based on substantial evidence and is consistent with the Regulations and case law.

Although Plaintiff argues that the ALJ ignored her GAF scores, the ALJ did consider that Dr. Vrtikapa reported that Plaintiff's GAF was 50 (Tr. 491), and correctly noted that a score of 50 was borderline, in that scores of 41 to 50 indicate serious symptoms and a score of 51 indicates only moderate symptoms and limitations. See n.1 below. Further, although in October 2012, Plaintiff also had a score of 48, in June 2012, Ms. Hultgren assessed Plaintiff's GAF as 55, which is clearly within the moderate range. (Tr. 311, 472). In any case, "the Commissioner has declined to endorse [GAF] score[s] for use in the Social Security and [SSI] disability programs, and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings." Jones v. Astrue, 619 F.3d 963, 974-75 (8th Cir. 2010) (quoting 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000) (internal quotations omitted). Further, ALJ may afford greater weight to medical evidence and testimony than to GAF scores. Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010). Finally, to the extent that the ALJ did not discuss all of Plaintiff's GAF scores, the ALJ's failure to do so was not outcome determinative. Karlix v. Barnhart, 457 F.3d 741, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports her overall conclusion." (citing Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003)).

In conclusion, the court finds that the ALJ's determination that Plaintiff did not meet the criteria for Listing 12.04 is based on substantial evidence and is consistent with the Regulations

and case law. Because the ALJ found that Plaintiff did not meet or medically equal Listing 12.04, the ALJ proceeded to determine Plaintiff's RFC. 20 C.F.R. § 404.1520a(d)(3). As discussed above, the ALJ found that Plaintiff had the RFC for sedentary work with additional environmental and exertional and non-exertional limitations. The court finds that the ALJ's RFC determination is based on substantial evidence and is consistent with the Regulations and case law.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint (Docs. 1, 20) is **DENIED**;

**IT IS ORDERED** that a separate judgment be entered incorporating this Memorandum and Order.

Dated this 27th day of September, 2016.

     /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE